[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-13062

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 16, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 00-01334-MD-FAM


LEONARD J. KLAY, M.D., et al.,

Plaintiffs,

versus

ALL DEFENDANTS, et al.,

Defendants,

HUMANA, INC.,
HUMANA INSURANCE COMPANY,
COVENTRY HEALTH CARE OF GEORGIA, INC.,
f.k.a. Principal Health Care of Georgia, Inc.,
UNITED HEALTHCARE OF FLORIDA, INC.,
HEALTH NET, INC.,
f.k.a. Foundation Health, et al.,

Defendants-Appellees,

AMERICAN MEDICAL ASSOCIATION,

Appellant.

Appeal from the United States District Court
for the Southern District of Florida

_____

**(September 16, 2005)**

Before TJOFLAT, PRYOR and ALARCÓN[*], Circuit Judges.

PRYOR, Circuit Judge:

This appeal presents an issue of first impression: whether the requirement of reasonable compensation in Federal Rule of Civil Procedure 45(c)(3)(B) obliges a party that has compelled, by subpoena, the production of confidential data to pay a license fee for the data, even though the district court, by protective order, limited the use of the data to litigation purposes, avoided any diminution of the value of the data, and required the payment of the production costs of the data. The American Medical Association, a nonparty, was commanded to produce its annual reports regarding physicians' income and medical practices and the underlying data for those reports. The defendants, including many of the largest managed health care providers in the nation, sought that material to defend against the plaintiffs' complaint, which relied in part upon the AMA data. The AMA

_____

[*] Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

contends that it was entitled to the license fee it ordinarily charges for its reports. We conclude that the district court did not abuse its discretion when it required the managed care providers to pay the AMA only its production costs, because the AMA did not suffer a loss in the value of its property.

## I. BACKGROUND

In the class action that led to this appeal, numerous physicians and independent physicians' associations sued many of the nations' largest managed care providers and alleged that the managed care providers systematically underpaid for health care services rendered by the plaintiffs. See Klay v. Humana, Inc., 382 F.3d 1241, 1246 (11th Cir. 2004). During discovery, the managed care providers served the physicians with an interrogatory that required the physicians to identify all evidence supporting their allegations of a racketeering conspiracy by the managed care providers. In their answer to that interrogatory, the physicians identified reports of statistics compiled by the AMA that purported to show that physicians' income declined during the class period as a result of actions of the managed care providers.

The reports, for which the physicians paid a license fee, were outlines of survey data compiled during "large scale socio-economic surveys of physicians" conducted by the AMA over fifteen years. From 1986 to 2000, the AMA referred

3

to the surveys as the "Socioeconomic Monitoring System Core Surveys," and from 2002 to the present, the AMA entitled the surveys the "Patient Care Physician Survey." The reports of those surveys, referred to as the "Product Release Data," include information regarding physicians' net income from medical practice, expenses, working hours, and the type and number of managed care contracts.

The AMA uses the data for internal purposes and licenses the data to any person or corporation willing to pay the license fee. The AMA charges for-profit entities $13,000 per year and non-profit entities $6,500 per year for the Product Release Data, and the AMA requires licensees to sign an agreement "that the data cannot be disseminated to or used by persons other than the licensee without the consent of the AMA." If the AMA did not protect its confidentiality, the data would lose its commercial value.

After the physicians identified the Product Release Data, the managed care providers served a subpoena on the AMA for both the Product Release Data and the "Non-Aggregated Raw Data" that underlay the reports. The AMA objected to the subpoena, under Rule 45(c)(3)(B), on the ground that the managed care providers did not show a "substantial need" for the data. The AMA also stated that the confidential nature of the data was threatened by the subpoena, particularly because the managed care providers sought not only the Product

4

Release Data, but the Non-Aggregated Raw Data, which the AMA stated had never been released outside of the AMA. The AMA argued alternatively that, if the subpoena was enforced, the managed care companies should pay the ordinary license fee paid by for-profit entities for all years of the Product Release Data listed in the subpoena, for a total of $195,000.

The district court referred the dispute to a Special Master, who recommended that the subpoena be enforced, because the managed care providers had established, as required by Rule 45(c)(3)(B), a substantial need for the data that could not be otherwise met without undue hardship. The Special Master also recommended that the AMA "be reimbursed for expenses incurred in its efforts to comply with the subpoena," but that the demand of the AMA for the license fee be denied. The Special Master explained that it was unreasonable to expect "a litigant who has no profit motive whatsoever in possessing the information" to pay the license fee. Over the objection of the AMA, the district court adopted the report and recommendation of the Special Master.

Under the "Amended Protective Order Governing Protected Material Other Than Confidential Health Information," which had been entered by the district court in the underlying managed care litigation, the AMA designated the data as "highly confidential," which could be disclosed only to the managed care

5

providers' outside counsel, independent retained experts, and other litigation personnel. Officials of the managed care providers were not allowed to view the material in any manner. In addition, the attorneys and experts for the managed care providers were not permitted to use the material "for any purpose other than the prosecution or defense of this litigation." With these significant restrictions in place, the AMA produced the data.

## II. STANDARD OF REVIEW

A district court is "entitled to broad discretion in managing pretrial discovery matters." Perez v. Miami-Dade County, 297 F.3d 1255, 1263 (11th Cir. 2002). Although the court has substantial discretion in the allocation of costs in discovery, see Tilton v. Capital Cities/ABC, Inc., 115 F.3d 1471, 1475 (10th Cir. 1997), the interpretation of the term "reasonable compensation" in Rule 45(c)(3)(B) is a question of law that we review de novo. Silvious v. Pharaon, 54 F.3d 697, 700 (11th Cir. 1995) (per curiam). So long as the interpretation of Rule 45(c)(3)(B) was correct and the record contains evidence upon which the district court "rationally could have based its decision," Ariel v. Jones, 693 F.2d 1058, 1060 (11th Cir. 1982) (per curiam), the ruling of the district court must be affirmed.

## III. DISCUSSION

The AMA and the managed care companies present arguments in stark opposition regarding the meaning of Rule 45(c)(3)(B). The AMA contends that the "language and syntax" of Rule 45(c)(3)(B) requires that the AMA be "fairly compensated" for the value of the intellectual property subject to the subpoena, in addition to the costs of production. The AMA argues that Rule 45(c)(3)(B) is broader than Rule 45(c)(2)(B), which requires a party seeking to enforce a subpoena to pay the costs of producing the material. The AMA also argues that the Advisory Committee Notes to the 1991 Amendments, which added subdivision (c) to the current Rule 45, show that Rule 45(c)(3)(B) prohibits the "taking of intellectual property" in litigation through the use of the subpoena power.

The managed care providers contend that Rule 45 is intended to protect the confidentiality of intellectual property and avoid undue costs and burdens from compliance with a subpoena. The managed care providers contend that the district court protected both of those interests through its stringent protective order and requirement that the managed care providers bear the costs of producing the data subject to the subpoena. The managed care providers also contend that nothing in the language, structure, or purpose of Rule 45 supports the position of the AMA.

This discussion is divided into three parts. We begin with an examination of the text of Rule 45(c)(3)(B) to determine whether the enforcement of a

7

subpoena for confidential data requires the payment of reasonable compensation.

We then examine the meaning of the term "reasonable compensation" in Rule

45(c)(3)(B).  Finally, we examine whether the district court abused its discretion

when it limited the compensation owed the AMA to the costs of producing the

data.

### A.  Rule 45(c)(3)(B)(i) Requires Reasonable Compensation for the Production of Confidential Material.

We begin, as we must, with the text of the Rule.  Federal Rule of Civil

Procedure 45 governs the manner in which parties may obtain evidence by

subpoena.  Entitled "Protection of Persons Subject to Subpoenas," Rule 45(c) is

intended to prevent abuse of the subpoena power and requires that a district court

protect the property rights of the person subject to the subpoena:

If a subpoena

> (i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

> (ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

> (iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial,

> the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued

8

shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

Fed. R. Civ. P. 45(c)(3)(B).

A district court has a few options to address the effects of a subpoena that requires the disclosure of a trade secret or other confidential information under Subdivision (i). A district court may either quash or modify the subpoena, and the district court "may order appearance or production . . . upon specified conditions." Id. In this appeal, the district court chose the latter of these alternatives.

When a district court orders the production of material under Subdivision (i), the plain language of the Rule requires the district court to make two determinations: (1) whether the party who seeks that material has "a substantial need for the testimony or material that cannot be otherwise met without undue hardship"; and (2) the reasonable compensation owed to the person subject to the subpoena. Fed. R. Civ. P. 45(c)(3)(B). The parties do not dispute that the managed care providers established a substantial need for the data that could not otherwise be met without undue hardship. Their dispute is about the ruling on reasonable compensation.

Before we turn from the text of the Rule, we must address an argument for a

narrower construction of the obligation for reasonable compensation. The managed care providers erroneously argue that the Advisory Committee Notes to Rule 45(c)(3)(B) establish that the requirement of reasonable compensation does not apply to Subdivision (i), because the Notes refer only to the compensation of expert witnesses and nonparty witnesses burdened by lengthy travel. The problem with this argument is that the text of the Rule, not the Notes, governs.

If the drafters did not intend for the reasonable compensation requirement to apply to Subdivision (i), then they would have placed the reasonable compensation language within Subdivisions (ii) and (iii), instead of within the final paragraph following all three subdivisions. The drafters did not do so. According to the plain language of the Rule, reasonable compensation must accompany the disclosure of confidential research, because all three subdivisions of Rule 45(c)(3)(B) are subject to that requirement.

*B. Rule 45(c)(3)(B)(i) Requires Reasonable Compensation for a Loss Caused by the Production of Confidential Material.*

We turn next to the meaning of reasonable compensation in Rule 45(c)(3)(B)(i), which includes more than inspection and copying costs. As the AMA correctly argues, the drafters of Rule 45(c) knew the difference between costs of production and other forms of compensation. Subdivision (c)(2)(B) of

Rule 45, for example, states that an order to compel production "shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded." Fed. R. Civ. P. 45(c)(2)(B). The drafters of Rule 45 could have used that narrower language in Subdivision (c)(3)(B) had they intended to limit compensation to the costs of production.

Although reasonable compensation may require more than reimbursement for the costs of production, it need not always be so. The term "reasonable compensation" is both broad and flexible. As the Advisory Committee Notes explain, the drafters of Rule 45(c)(3)(B) intended to protect persons subject to a subpoena from both unnecessary expense and unwarranted or unduly harmful disclosures of confidential information. If the only compensation reasonably owed is the cost of production, then Rule 45(c)(3)(B) requires no more.

The Advisory Committee Notes also establish that the drafters of Rule 45(c)(3)(B) sought to prevent the uncompensated taking of intellectual property. The comments to Subdivision (c)(3)(B)(ii), for example, reflect the concern of the drafters that the subpoena power could be used to deprive expert witnesses of the opportunity to bargain for the value of their services:

> Clause (c)(3)(B)(ii) provides appropriate protection for the

intellectual property of the non-party witness. . . . A growing problem has been the use of subpoenas to compel the giving of evidence and information by unretained experts. Experts are not exempt from the duty to give evidence, even if they cannot be compelled to prepare themselves to give effective testimony . . . , but compulsion to give evidence may threaten the intellectual property of experts denied the opportunity to bargain for the value of their services. . . . Arguably the compulsion to testify can be regarded as a "taking" of intellectual property. The rule establishes the right of such persons to withhold their expertise, at least unless the party seeking it makes the kind of showing required for a conditional denial of a motion to quash as provided in the final sentence of subparagraph (c)(3)(B); that requirement is the same as that necessary to secure work product under Rule 26(b)(3) and gives assurance of reasonable compensation. . . .

Fed. R. Civ. P. 45(c)(3)(B)(ii) advisory committee's note. Although Subdivision (c)(3)(B)(i) does not concern expert testimony, the comments to Subdivision (c)(3)(B)(ii) are illustrative.

Describing the effects of a subpoena under Subdivision (c)(3)(B)(ii) as a taking of intellectual property is consistent with the language of Rule 45(c)(3)(B) as a whole. Rule 45(c)(3)(B) requires reasonable compensation for certain forced uses of property owned by the person served with the subpoena. The question before us is the measure of compensation for a forced disclosure of confidential intellectual property.

Ordinarily compensation in law means the "[p]ayment of damages, or any other act that a court orders to be done by a person who has caused injury to

12

another and must therefore make the other whole." Black's Law Dictionary 277 (7th ed. 1999). Put another way, compensation is required when compliance with a subpoena causes an actual property loss. An expert witness, for example, suffers a property loss when he is forced to testify; the witness no longer has bargaining power relative to the party seeking the witness's testimony.

Our understanding of the term "reasonable compensation" is informed by our takings jurisprudence. We have explained that, in a taking of real property, "just compensation is determined by the loss to the person whose property is taken." Ala. Power Co. v. F.C.C., 311 F.3d 1357, 1369 (11th Cir. 2002). "Put differently, '[t]he question is, What has the owner lost? not, What has the taker gained?'" Id. (quoting United States v. Va. Elec. & Power Co., 365 U.S. 624, 635, 81 S. Ct. 784, 792 (1961)). In this context, as in the law of remedies, "an aggrieved party should be put in as good a position as he was in before the wrong, but not better." Ala. Power Co., 311 F.3d at 1369.

The measure of the compensation owed in a takings case depends on the nature of the property. In an ordinary takings case, one party's gain directly corresponds to another party's loss. Id. That measure is common because "most property is rivalrous—its possession by one party results in a gain that precisely corresponds to the loss endured by the other party." Id.

13

A different rule prevails for another form of property. If the property is nonrivalrous—i.e., one party's use of the property "does not necessarily diminish the use and enjoyment of others"—compensation for the nonrivalrous use of the property will ordinarily be limited to the marginal cost incurred by that use. See id. This limitation is proper even if the taking deprives the owner of the opportunity to sell the use of its property at a desired price, because the "one immutable principle in the law of just compensation . . . is that the value to the taker is not to be considered, only loss to the owner is to be valued." Id. at 1370 (quoting Metropolitan Transp. Auth. v. ICC, 792 F.2d 287, 297 (2d Cir. 1986)).

Like the law of takings, Rule 45(c)(3)(B) governs forced disclosures of both rivalrous and nonrivalrous property. Expert testimony is a form of rivalrous property, because the measure of its loss to the owner is the same as the gain to its taker. Confidential information is a form of nonrivalrous property, and that fact affects the measure of compensation for its taking.

The gain to the party seeking confidential information through a subpoena is not the measure of compensation reasonably owed to the owner of that information. The measure is the loss to the owner of the property. If the enforcement of a subpoena under Rule 45(c)(3)(B) causes no loss, then the amount of compensation reasonably owed will be zero. If the loss to the owner of the

14

information is substantial, then so will be the amount of compensation even if the gain to the taker of the information is slight.

### C. The District Court Did Not Abuse its Discretion When it Denied the License Fee Sought by the AMA.

With that understanding of compensation in mind, we turn to whether compliance with the subpoena caused a loss to the AMA. As we have explained, the use of the data by the managed care providers was strictly limited by the district court. According to the terms of the protective order, that material was designated as "highly confidential." The data could be disclosed only to the managed care providers' outside counsel, independent retained experts, and other litigation personnel. In addition, the representatives of the managed care providers were not permitted to use the material "for any purpose other than the prosecution or defense of this litigation."

With these strict limitations on the use of the data, the AMA did not suffer a loss in the commercial value of its property. The protective order ensured that the confidential nature of the data was not threatened. The disclosure to outside counsel of that material did not deprive the AMA of the use of its property in any way. The disclosure also did not deprive the AMA of the opportunity to sell its intellectual property at its market price to any willing buyers, including the

15

managed care providers, because the managed care providers were not allowed to use this data for nonlitigation purposes. The AMA did not present any evidence that the value of its intellectual property would be harmed by compliance with the order of production. The district court did not abuse its discretion, therefore, when it determined that the compensation owed to the AMA was limited to the cost of producing the data.

This appeal is similar to Alabama Power, in which the Federal Communications Commission ordered the Alabama Power Company to allow cable television providers access to its utility poles. Alabama Power objected, under the Just Compensation Clause, to the rate imposed by the FCC for such access. Ala. Power Co., 311 F.3d at 1360-61. We rejected the argument of Alabama Power and held that, because the use of the utility poles was nonrivalrous and did not deprive Alabama Power of the opportunity to sell access to other providers, the compensation owed to Alabama Power was limited to the marginal costs of allowing access to the cable providers. Id. at 1369-71.

As in Alabama Power, the AMA has not lost the opportunity to sell its product to other persons, including the managed care providers. As a result of the protective order, the confidential nature of the data has not been compromised. Although the AMA would have preferred to receive the license fee it ordinarily

16

charges for this confidential material, the subjective desires of the AMA are immaterial to whether it has suffered a compensable loss. "[A]n aggrieved party should be put in as good a position as he was in before the wrong, but not better." Ala. Power Co., 311 F.3d at 1369 (emphasis added).

The decision of the district court to compel production of the data, without the payment of a license fee, was supported by basic principles of due process. There is a "fundamental responsibility of every person to give testimony," Garner v. Wolfinbarger, 430 F.2d 1093, 1100 (5th Cir. 1970), and the duty to provide evidence "has long been considered to be almost absolute. . . ." In re Grand Jury Subpoena Duces Tecum, 555 F.2d 1306, 1308-09 (5th Cir. 1977). The managed care providers sought access to the data of the AMA for the limited purpose of the defense of a lawsuit in which their adversaries paid the AMA its license fee and relied upon the data in the prosecution of their claims for relief. If the district court had agreed with the AMA, then the access of the managed care providers to information vital to their defense would have been conditioned upon the payment of a windfall to the AMA. Rule 45(c)(3)(B) did not require that result.

## IV. CONCLUSION

Because the AMA suffered no loss in the value of its property from its compliance with the subpoena, on the conditions provided by the order of

17

production and protective order, the district court did not abuse its discretion when it required the managed care providers to pay the AMA its production costs, but not the license fee for the data.

**AFFIRMED.**