[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-10207
Non-Argument Calendar
_____

D.C. Docket No. 2:17-cv-14177-RLR


MONICA STONE,

Plaintiff- Appellant,

versus

ROBERT HENDRY,
ROBERT FEIPEL, et al.,

Defendants- Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 10, 2019)

Before MARTIN, NEWSOM, and ANDERSON, Circuit Judges.

PER CURIAM:

Monica Stone ("Stone") appeals the district court's grant of summary judgment in favor of Defendants Correctional Officer Christopher Rose ("Rose"), Correctional Officer David Bailes ("Bailes"), Warden Robert Hendry ("Hendry"), Sergeant Robert Feipel ("Feipel"), and Nurse Carolyn Conrad ("Conrad"). Stone—the mother of, and personal representative of the estate of, Christopher Cox ("Cox")—brought suit against the Florida Department of Corrections, the Warden of the Martin Correctional Institution ("MCI"), multiple correctional officers, and a nurse for the death of her son, who was killed by his cellmate Hurley Brown ("Brown"). On appeal, Stone argues that the district court erred in finding that the defendants were not liable for Cox's death on several theories and seeks to hold the defendants liable under 42 U.S.C. § 1983 for constitutional violations that led to Cox's death. For the reasons given below, we affirm the judgment of the district court.

I.

Because we write only for the parties, and in light of the voluminous record, we assume the parties' familiarity with the facts and only briefly summarize them here. We discuss the relevant facts in more detail in the sections of this opinion analyzing each of Stone's claims. We view the facts in the light most favorable to Stone and draw all inferences in her favor.

2

On March 13, 2015, Cox, an inmate at Martin Correctional Institute, was moved into a cell with Brown. Brown had an extensive criminal history and was sentenced to 35 years for a robbery conviction in 1998. He had a history of threats and violence while in prison. Both Cox and Brown sought "protective management" status, or removal from general population for personal protection reasons. Both men had been denied that status and were in administrative confinement—housing meant to keep inmates secure while other proceedings or decisions are being made—pending their appeals. Both were housed in Dormitory D, where MCI houses inmates with "special confinement status." Guards are required to check on inmates in administrative confinement every half hour at irregular intervals.

Cox feared moving into Brown's cell, according to neighboring inmates, whose comments were collected in a report by Special Agent Eric Jester. There is no evidence in the record that the concerns of either Cox or his neighbors were communicated to MCI personnel.

At 6:25 pm on March 15, 2015, guards conducted a cursory cell check in Dormitory D, which did not include looking into Brown's and Cox's cell. No check occurred at 7:00 pm.

Between 6:50 pm and 7:00 pm, inmates whose cells neighbored Brown's and Cox's sensed a struggle between Brown and Cox. Around 7:15 pm, inmates

3

began yelling "Man Down!" throughout Dormitory D, meaning that an inmate was in distress. Guards did not reply to these collective cries. The only evidence of an alert being communicated to a guard comes from inmate Derek Wells, who told Special Agent Jester that he yelled to defendant Bailes, who was checking the perimeter of Dormitory C, that a man was being killed in a nearby cell.

Defendant Feipel, accompanied by defendant Conrad, entered Dormitory D around 7:25 pm to conduct a security, safety, and sanitation check. Feipel briefly left the dormitory to retrieve his radio. Once back in the dormitory, he realized what the inmates were trying to communicate to him and went to Cox's and Brown's cell. He called Conrad to assist him.

In the cell, Feipel and Conrad saw Cox unresponsive, face down, with a noose-like ligature around his neck. Feipel handcuffed Brown and placed restraints on the unresponsive Cox, in accordance with procedure. Defendant Rose arrived, responding to Feipel's call for assistance, and escorted Brown out of the cell.

Feipel flipped Cox over. Conrad observed blood around his mouth and nose and an abrasion on his forehead. Cox was warm but pale. Conrad checked Cox's wrist pulse and found none; she observed no chest movement. She concluded that Cox was already dead and undertook no resuscitative measures. Neither Feipel nor Rose undertook resuscitative measures either.

4

Two other nurses responded to Feipel's and Conrad's call for medical assistance. Brown had stated that Cox had a seizure; the nurses thus thought they were responding to a seizure event and that they would be taking Cox back to the infirmary. They did not bring first-aid equipment with them to the cell.

Upon arrival, the nurses found Cox still warm to the touch. They began CPR and requested a defibrillator. When they attached the defibrillator to Cox, the machine did not detect heart activity. Emergency Medical Service arrived at 8:05 pm and pronounced Cox dead.

Cox's autopsy, performed May 19, 2015, declared the manner of death to be homicide; it does not estimate a time of death. Plaintiff's expert Dr. Sperry, M.D., opined that the degree of brain swelling documented in the autopsy suggests that Cox lived 15 to 30 minutes after Brown physically attacked him. This introduces the possibility that Conrad might have been able to revive him. Dr. Sperry did not assert with medical certainty whether Cox could have been revived when Feipel and Conrad first entered the cell.

Stone brought this suit against multiple MCI officers, who moved for summary judgment. In a detailed report, the magistrate judge recommended granting the defendants' motion; the district court adopted the report. Stone now appeals that decision, arguing that (1) Hendry and Feipel are liable for violating the 30-minute cell check rule, (2) Conrad and Rose are liable for failing to conduct

5

CPR, and (3) Bailes is liable for being informed of the assault on Cox but doing nothing to help. In addition, Stone argues that the district court erred in failing to permit Stone to engage in further discovery before its ruling on summary judgment.

## II.

We review a district court's disposition of a summary judgment motion based on qualified immunity de novo. Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002). We resolve all issues of material fact in the plaintiff's favor. Id. "We will affirm the grant of summary judgment if we conclude that there is no genuine issue of material fact—that is, if no 'fair-minded jury could return a verdict for the plaintiff on the evidence presented.'" Goodman v. Kimbrough, 718 F.3d 1325, 1331 (11th Cir. 2013) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986)).

We review a district court's discovery rulings for abuse of discretion. Benson v. Tocco, 113 F.3d 1203, 1208 (11th Cir. 1997).

## III.

A. Legal Standard

Stone sues the defendants under 42 U.S.C. § 1983, which permits suits for violations of federal rights by persons acting under color of state law. Stone's § 1983 claims require that she prove that the defendants' conduct violated a

6

constitutional right and that the challenged conduct was committed under color of state law.  Melton v. Abston, 841 F.3d 1207, 1220 (11th Cir. 2016).  Defendants invoke qualified immunity.  To overcome that immunity, Stone must show that (1) taken in the light most favorable to Stone, the facts show that the defendants' conduct violated a constitutional right, and (2) the right was clearly established at the time of the defendants' alleged misconduct.  Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001).  We therefore turn to whether defendants' conduct violated Cox's constitutional rights under the Eighth Amendment.

"The Eighth Amendment imposes a duty on prison officials to take reasonable measures to guarantee the safety of the inmates." Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir.2014) (internal quotations and alterations omitted).  Prisoners have a right to receive medical treatment for their illnesses and injuries, and deliberate indifference to those medical needs is a constitutional violation.  Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976).  Prison officials also cannot be deliberately indifferent to a substantial risk of serious harm to an inmate, including violence at the hands of other prisoners.  See Farmer v. Brennan, 511 U.S. 825, 833-34, 114 S. Ct. 1970, 1976-77 (1994).  Prison officials can violate an inmate's Eighth Amendment right in a supervisory capacity.  Harper v. Lawrence Cnty., Ala., 592 F.3d 1227, 1235-36 (11th Cir. 2010).

7

To succeed on her deliberate indifference claim against the defendants, Stone most show (1) that Cox had a substantial risk of serious harm or a medical need, (2) that the defendants subjectively acted with deliberate indifference to that risk or medical need, and (3) that the injury was caused by the defendants' wrongful conduct. Goodman, 718 F.3d at 1331; Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007).

This appeal turns on whether the defendants acted with deliberate indifference to cause harm to Cox. To satisfy the subjective deliberate indifference component, Stone must show (1) subjective knowledge of a risk of a risk of serious harm and (2) disregard of that risk by (3) conduct exceeding gross negligence. Id. at 1326-27; Goodman, 718 F.3d at 1331-32. To have subjective knowledge that an inmate faced a substantial risk of serious harm, a defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . must also draw the inference." Farmer, 511 U.S. at 837, 114 S. Ct. at 1979. "Proof of deliberate indifference requires a great deal more than does proof of negligence" and is "far more onerous than normal tort-based standards of conduct." Goodman, 718 F.3d at 1332.

B. Defendants Hendry and Feipel[1]

Stone argues that Hendry and Feipel were deliberately indifferent in their supervisory capacity because Cox's cell went unchecked for 90 minutes. Stone contends that this gap between cell checks constitutes deliberate indifference, particularly because the gap's length violated MCI's Post Order 10 and the Florida Administrative Code, both of which require cell checks at least every 30 minutes. The district court did not err in concluding that the 90-minute gap between cell checks, without evidence of subjective awareness of a risk of harm to Cox, cannot give rise to establish a constitutional violation. See Cagle v. Sutherland, 334 F.3d 980, 989 (11th Cir. 2003) (a 100-minute gap between checks, which violated jail policy, did not constitute deliberate indifference); Hale v. Tallapoosa Cnty., 50 F.3d 1579, 1582 (11th Cir. 1995) (a 150 minute gap between checks did not constitute deliberate indifference); see also Goodman v. Kimbrough, 718 F.3d at 1332 (stating that "failure to conduct the cell checks and head counts is negligence of the purest form" that does not justify liability under 42 U.S.C. § 1983).

Stone must point to record evidence from which a jury could conclude that Hendry and Feipel were subjectively aware of a risk of harm to Cox. The district court did not err in not finding any such evidence. "Our cases are clear that to

---

[1] In the district court, Stone argued that the defendants' method for pairing inmates in cells, and thus Cox's placement with Brown, violated Cox's constitutional rights. She does not maintain this argument on appeal.

9

survive summary judgment on a deliberate indifference claim, the plaintiff must present some evidence of prison officials' subjective awareness of a substantial risk of serious harm to the inmate." Goodman, 718 F.3d at 1333-34.  Subjective knowledge cannot be shown by demonstrating that an officer deviated from standard policy, or even that he was grossly unreasonable in his actions.  Id. at 1334; see also Taylor v. Adams, 221 F.3d 1254, 1259 (11th Cir. 2000) ("Failure to follow procedures does not, by itself, rise to the level of deliberate indifference because doing so is at most a form of negligence.").

Instead, Stone argues that the prison was a dangerous environment in which prisoners would use the timing of cell checks to "plan acts of misconduct."  Stone also quotes multiple inmates, including Brown, to emphasize the level of danger in Dormitory D.  But Stone points to no evidence from which a jury could find that Hendry or Feipel were subjectively aware of the risk of harm to Cox, or that they were deliberately lax in overseeing their inmates despite that awareness.[2]  Perhaps Hendry and Feipel should have known about the alleged conditions in Dormitory D.  But Goodman makes clear that the conclusion that an officer "should have

---

[2] For a case in which the plaintiff satisfied the subjective awareness requirement, see Rodriguez v. Sec. for the Dep't of Corrections, 508 F.3d 611, 618-22 (11th Cir. 2007) (holding that prison officials had subjective knowledge of an inmate's risk of assault because the inmate had relayed specific threats from gang members to several prison officials).

10

known" a given fact is not enough to imply subjective knowledge of that fact, and therefore not enough to impose liability under § 1983.  718 F.3d at 1334.

We therefore conclude that the district court did not err in granting summary judgment to Hendry and Feipel.

C.  Defendant Conrad

Stone argues that Nurse Conrad was deliberately indifferent to Cox's serious medical needs and that the district court should not have granted her motion for summary judgment.

As discussed above, to prove that Conrad acted with deliberate indifference, Stone must point to facts demonstrating that Conrad had subjective knowledge of a risk of serious harm and disregarded that risk through conduct that was more than gross negligence.  Goebert, 510 F.3d at 1327.  Deliberate indifference is not about "inadvertence or error in good faith," but rather about "obduracy and wantonness"—a deliberate refusal to provide aid despite knowledge of a substantial risk of serious harm.  Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 1084 (1986).

There is no evidence in the record from which a jury could conclude that Conrad was subjectively aware of Cox's need for medical assistance but wantonly refused to provide aide.  Conrad immediately checked Cox for signs of life and

11

found no wrist pulse.[3]  She also observed no chest movement.  Having perceived

no signs of life, she concluded that Cox was already dead and that resuscitative

measures would be useless.  This conclusion is regrettable and potentially tragic,

but there is nothing in the record indicating that it was made in bad faith.  It may

have been negligent—or even grossly negligent—but it was not an obdurate refusal

to render assistance that Conrad thought was necessary.

We therefore conclude that the district court did not err in granting summary

judgment in favor of Nurse Conrad.

D. Defendant Rose

Stone argues that the district court erred in granting summary judgment to

Rose because he knew that Cox required CPR but failed to perform it.[4]

Rose contends that he arrived at Cox's cell at 7:29 pm, where he was

ordered by Feipel to handcuff Brown.  He then escorted Brown to the shower area

for holding.  When Rose returned, Cox had been pronounced dead.

---

[3] There was a dispute below as to whether Nurse Conrad performed chest compressions.  In this summary judgment posture, we assume she did not.

[4] Stone's section header for the portion of her brief discussing Rose states that "Rose failed to take action when he would have heard inmates call for help over the intercom he was testing, where he entered a fictitious count on the Dorm Log for 7:00 p.m. at around the time of the murder of Cox."  These arguments are not developed in the section below and are consequently abandoned.  See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014).  Stone returns to the "fictitious entry" argument in her reply brief; arguments raised for the first time in a reply brief are also abandoned.  Id. at 682-83.

Stone offers no evidence from which a jury could find that Rose acted with deliberate indifference—that is, that he acted with a subjective knowledge of a risk of serious harm, that he disregarded that risk, and that his conduct exceeded gross negligence.  Goebert, 510 F.3d at 1327.  Nothing in the record indicates that Rose, who is not a medical doctor, had actual knowledge that Cox was anything but already dead.  Because he was not medical personnel, Rose was entitled to rely on the medical judgments of Nurse Conrad.  See Johnson v. Doughty, 433 F.3d 1001, 1011 (7th Cir. 2006) ("Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals.").

We therefore conclude that the district court did not err in granting summary judgment to Rose.

E. Defendant Bailes

Stone argues that the district court erred in granting summary judgment to Bailes because the witness testimony of inmate Derek Wells, Cox's neighbor in the next cell over, places him near the scene of the murder and establishes that he was aware of Cox's death.  According to the report of Special Agent Eric Jester, Wells called out to a corrections officer who was performing the perimeter check at Dormitory C.  The report states that this corrections officer was "[l]ater identified as CO David Bailes."  The report states that Wells alerted Bailes that a man was

13

being murdered in the next cell over at approximately 7:15-7:20 pm. Stone argues that Bailes heard this alert and had an obligation to help Cox.[5]

Bailes's affidavit states instead that he started his shift at 7:00 pm and was finishing pre-shift tasks too far away from Dormitory D (where Cox and Wells were domiciled) to hear anything. He learned of the situation when his Captain received a radio call at approximately 7:30 pm. And he arrived within two to three minutes and assisted officers in Dormitory D before returning to Dormitory C. Jester's report also states that CO Huertas-Rodriguez was doing the Dormitory C perimeter check, and therefore would have been the corrections officer to whom Wells called out. Huertas-Rodriguez denied hearing any calls from Dormitory D.

We will assume, as the district court did, that Bailes was made aware of Cox's situation through Wells's warning, something Bailes disputes.[6] Even so, this does not support a finding of liability. Wells stated that he called out to Bailes between 7:15 and 7:20 pm. Prison staff entered Cox's dormitory at 7:22 pm, arrived at Dormitory D around 7:25 pm, and first reached Cox's cell at 7:29 pm.

---

[5] On appeal, Stone no longer argues that Bailes was deliberately indifferent in failing to perform resuscitative measures upon arriving at Cox's cell. As non-medical personnel, Bailes was in the same position as Rose, and would not be liable for the same reasons.

[6] Bailes does say that he spoke with Wells, but only after entering Dormitory D to respond to Sergeant Feipel's call for assistance. Bailes says that Wells told him that Wells had yelled at an officer out the window.

14

This delay of five to ten minutes cannot support Stone's claim.[7] See Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1318 (11th Cir. 2010) (when an officer and a nurse arrived within approximately five minutes after a prisoner's cellmate signaled for help, "[t]he term 'delay' hardly seems to fit the facts at all; but to the extent that one could call the time involved in this case 'delay,' it was only a matter of minutes"); see also Dang ex rel. Dang v. Sheriff, Seminole Cnty. Fla., 871 F.3d 1272, 1283 (11th Cir. 2017) (holding that a 15-minute delay in a pretrial detainee's transport to an emergency room was not a constitutional violation). Once prison officials become aware of an incident, it will inevitably take some time for them to respond. Under the circumstances, we cannot say that the officers took too long in responding.

Ultimately, it appears that, upon becoming aware of the situation, prison officials went to Cox's dormitory as quickly as they could. There is nothing in the record on the basis of which a jury could find Bailes liable.

We thus conclude that the district court did not err in finding that Bailes could not be held liable under this cause of action.

IV.

---

[7] In other words, even if Bailes were aware of the danger in Cox's cell, other officers entered Cox's cell within five to ten minutes and were unable to prevent harm to Cox. Thus, no reasonable jury could conclude that Bailes's actions caused Cox's injury.

15

Stone finally argues that the court below erred in denying her request for additional discovery, including Fed. R. Civ. P. 30(b)(6) depositions.

Fed. R. Civ. P. 56(d) permits a court to defer its consideration of a motion for summary judgment and permit a nonmovant time to obtain necessary affidavits or declarations or to take discovery. District courts have broad discretion in managing pretrial discovery matters. Klay v. All Defendants, 425 F.3d 977, 982 (11th Cir. 2005). A district court's decision to deny a 56(d) motion is reviewed for abuse of discretion. Fla. Power & Light Co. v. Allis Chambers Corp., 893 F.2d 1313, 1315 (11th Cir. 1990).[8]

Stone offers no explanation why the district court's denial of her 56(d) motion for additional discovery was an abuse of discretion. The record indicates that it was not. The parties had scheduled eight months to conduct discovery, and they stipulated to a month longer than that. The magistrate judge held a conference to determine what additional discovery might be needed. And Stone requested 30(b)(6) depositions for the first time at the conference. We therefore cannot say that the district court committed an abuse of discretion in ending the discovery process. See Josendis v. Wall to Wall Repairs, Inc., 662 F.3d 1292, 1307 (11th

---

[8] Rule 56(d) was formerly styled 56(f) in the Federal Rules—hence the case law's frequent reference to "56(f)."

16

Cir. 2011) (holding that keeping litigants to the terms of a scheduling order is not an abuse of discretion).[9]

V.

For these reasons, we affirm the judgment of the district court.

**AFFIRMED**.[10]

---

[9] In her reply brief, Stone argues that the Roten Affidavit should have been considered by the district court despite its admittedly late disclosure. Arguments raised for the first time in a reply brief are considered abandoned. Sapuppo, 739 F.3d at 682-83. We have not considered statements in Stone's brief citing to the Roten affidavit.

[10] We accordingly deny Stone's request for oral argument.